**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| LESTER JAMES SMITH, | : |
| Plaintiff, | : |
| v. | : CASE NO.: 5:12-CV-26 (WLS) |
| GREGORY DOZIER, | : |
| Defendant. | : |

## BENCH OPINION

### I. Procedural Background

On January 24, 2012, Plaintiff filed a *pro se* Complaint alleging that the Georgia Department of Corrections' ("GDOC's") grooming policy violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* (Doc. 1; *see* Doc. 183-22 at 6-7.) Because the policy forbids inmates from growing facial hair in excess of one half-inch in length (Doc. 183-22 at 7), Plaintiff pleaded that the grooming policy substantially burdens the exercise of his sincerely held religious beliefs because Islam prohibits him from shaving his beard. (Doc. 1.) Plaintiff sought nominal damages and an injunction to allow him to grow a beard for religious reasons. (Doc. 1 at 5.) After the Court granted Defendant's first Motion for Summary Judgment, Plaintiff appealed to the Eleventh Circuit on March 6, 2014. (*See* Docs. 125 & 129.)

On February 17, 2017, the Eleventh Circuit vacated and remanded this case, instructing this Court to analyze Plaintiff's RLUIPA claim in a manner consistent with *Holt v. Hobbes*, 135 S. Ct. 853 (2015). *Smith v. Owens*, 848 F.3d 975, 981 (11th Cir. 2017). The Eleventh Circuit also appointed Plaintiff counsel, and Plaintiff's appointed counsel continues to represent him in this case. *Smith*, 848 F.3d at 978; (*see* Docs. 149 & 212).

On remand, this Court adopted U.S. Magistrate Judge Charles Weigle's Recommendation to deny both Parties' Motions for Summary Judgment and set the case for a non-jury trial because Plaintiff was only authorized to receive injunctive and declaratory

1

relief. The Court held a bench trial in this case on November 5-6, 2018. (*See* Docs. 228 & 229.) The Parties submitted exhibits and filed posttrial closing arguments, along with proposed findings of fact and conclusions of law. (Docs. 231, 232, 238, 239, 240.)

Rule 52(a) of the Federal Rules of Civil Procedure requires that after a non-jury trial, a court must "find the facts specially and state its conclusions of law separately" and that judgment be entered under Rule 58. Accordingly, having reviewed the evidence and briefs in their entirety, the Court makes the following findings of fact and conclusions of law.

## II. Findings of Fact

GDOC has approximately 53,000 inmates and is the fourth largest prison system in the country. (Doc. 235 at 25.) Approximately 67% of those in its inmate population were convicted of violent or sexual offenses, and that number rises to 81% in the close security prisons. *Id.* at 26. Gangs within the prison system use physical features to identify themselves, and gang identification can lead to violence within prisons. Muslim inmates have been known to grow their beard and trim their mustache as a way to identify with other Muslims, and they sometimes engage in violence or smuggling of contraband as a group, similar to gangs. (Doc. 235 at 34, 130-131.) Muslim inmates can also self-identify by wearing kufis on their head, but kufis are not always worn by Muslim inmates. (Doc. 235 at 131.) Turnover of staff in GDOC's prisons is high, and it is unable to fill all of its security positions. GDOC is unaware of the percentage of violent offenders or gang members at non-GDOC prisons. (Doc. 190-3 at 5.)

Plaintiff Lester James Smith is an inmate in the custody of the GDOC serving a life sentence for murder and armed robbery, among other convictions. (Doc. 183-3 at 12:12-13:22.) Smith has been housed at various prisons, and at the time of the bench trial was housed at Telfair State Prison, a close security prison for inmates at a high-risk for violence or escape. Smith has been classified as a close security prisoner, although a prisoner's classification can change based on his disciplinary issues or participation in groups and programming. While in prison, Smith has been found guilty of numerous disciplinary offenses, including, *inter alia*, failure to follow instructions, insubordination, possession of a weapon, possession of a cell phone, possession of a drug or narcotic, under the influence of drugs, bribery, injury to an officer, and injury to an inmate/oneself. (Doc. 183-6.)

Smith is also a Muslim, and has a sincere belief in the tenets of Islam, including the tenet that he not trim his beard and, that if he must trim it, to maintain at least a fistful of beard hair. (*See* Doc. 183-3 at 25.) As a result, Smith requested a religious accommodation from GDOC to be allowed to grow a beard, but his request was denied because GDOC's policy prohibits inmates from growing a beard longer than one half-inch for any reason. (Doc. 190-3 at 3.) Contraventions of GDOC's policy will lead to disciplinary action, and Smith has been forcibly shaven on at least three prior occasions. *Id.* at 2.

Smith's affinity for his Muslim brothers has also induced Smith to violence within Georgia's prisons. For example, in one incident where his Muslim "brother" was talking with the lieutenant about getting his property back, the argument escalated and after the officers allegedly "jumped on" the inmate, Smith intervened and was given a disciplinary charge for his behavior. (Doc. 183-3 at 35.) In another incident where one of his Muslim "brothers" was allegedly jumped on by officers, Smith alleges that he and half of the dorm got involved, and that Smith struck one of the officers with his fist. *Id.* at 38-39.

Previously, GDOC did not allow beards of any length, but after the U.S. Supreme Court held that Arkansas Department of Corrections' grooming policy violated RLUIPA insofar as it prevented the petitioner from growing a half-inch beard,[1] GDOC changed its policy to allow half-inch beards. *Smith v. Owens*, 848 F.3d 975, 978 (11th Cir. 2017); (Doc. 183-22 at 7.) GDOC's policy states that "[b]eards cannot be worn without a mustache." (Doc. 183-22 at 7.) GDOC's policy also allows male inmates to grow their head hair to three inches in length and allows female inmates to grow their head hair to any length. (Doc. 183-22 at 6-8.) Georgia is among a small minority of states that restricts beards to one half-inch or less and does not allow any religious exemptions. Thirty-seven states, as well as the District of Columbia and the Federal Bureau of Prisons ("BOP"), allow inmates, either by their standard policy or through an exemption, to grow a beard without any length restriction. The BOP allows inmates to grow their head and beard hair to any length. When searching prisoners, the BOP uses a self-search method where inmates are required to vigorously frisk, twist, and move

---

[1] *Holt v. Hobbs*, 135 S. Ct. 853 (2015).

3

their own beards, and doing so can deter inmates from using their beards to hide contraband. (Doc. 236 at 116-119.)

### III. Conclusions of Law

Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA") to "provide greater protection for religious exercise than is available under the First Amendment." *Holt*, 135 S.Ct. at 859-60 (explaining that RFRA was the precursor to RLUIPA). Congress mandated that the concept of religious exercise under RLUIPA "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution." *Id.* at 860 (citation omitted). Pursuant to RLUIPA, once a claimant establishes that a policy substantially burdens his exercise of a sincerely held religious belief, the government must prove that the challenged policy (1) furthers a compelling government interest and (2) is the least restrictive means of furthering the identified governmental interest. 42 U.S.C. § 2000cc-1(a); *Holt*, 135 S. Ct. at 863. Courts cannot "elevate accommodation of religious observances over an institution's need to maintain order and safety,' and an accommodation must be measured so that it does not override other significant interests.'" *Knight v. Thompson*, 797 F.3d 934, 943 (11th Cir. 2015) (citation omitted). Nonetheless, "'[t]he least-restrictive-means standard is exceptionally demanding," and it requires the government to "'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Holt*, 135 S.Ct. at 864.

Plaintiff argues that most other states have a less restrictive alternative than GDOC's half-inch beard policy and that GDOC's policy is not the least restricted means of furthering its asserted interests. (Doc. 177-1.) GDOC admits that its grooming policy limiting inmates' beards to a half-inch substantially burdens Smith's exercise of a sincerely held religious belief. (Doc. 190-3 at 1, 3; Doc. 183-1 at 7 n.3.) This fact is supported by the record: Smith converted to Islam over eight years ago, sincerely believes in the religion, and the policy prevents him from growing a beard in accordance with his religion and punishes him if he does so. (*See* Docs. 183-3 & 183-22.) However, GDOC argues that there are numerous compelling governmental interests served by enforcing a policy that limits beard length: safety, security, and uniformity, minimizing the flow of contraband, identification of inmates, hygiene, and cost. (Doc. 183-1.) The Court agrees that, generally, these are compelling governmental

4

interests;[2] thus, the Court must determine whether GDOC's grooming policy furthers those interests using the least restrictive means.

## A. Under-inclusiveness of GDOC's Grooming Policy

A policy is underinclusive when it prohibits a type of activity to further the government's interests but does not prohibit analogous conduct that poses similar risks to the same alleged interests. *See Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993). The under-inclusiveness of a policy indicates that it may not be the least restrictive means of furthering a particular interest. *See Holt*, 135 S.Ct. at 866. For the reasons that follow, the Court finds that GDOC's grooming policy is inconsistent and underinclusive.

### 1. Dangerousness of Searching Beards

In GDOC's prisons, female inmates can grow head hair of any length but male inmates can grow head hair of three inches and beard hair of only half an inch. (Doc. 183-22 at 6-8.) GDOC argues that male head hair can be more easily searched from behind than beards which have to be searched face-to-face, posing a danger to prison staff. (Doc. 235 at 43-44; Doc. 179 at 42-43; Doc. 183-5 at 6.) But the record as presented by Plaintiff and Defendant does not indicate that guards would have to physically search inmates' beards face-to-face and expose themselves to being struck.

GDOC's witness, Ronald Angelone, testified during the bench trial on the various prison systems in which he's worked and his opinions on the issues involved in this case. Angelone currently works as a consultant to directors of correctional institutions, but previously worked at several state's prisons, including for Virginia's prison system, Illinois' maximum-security prisons, Marion Correctional Treatment Center (a maximum-security prison for emotionally disturbed inmates), a medium security prison for emotionally disturbed inmates in Oklahoma, as regional director in the Texas Department of Corrections, and as deputy director and director in Nevada. (Doc. 236 at 6-9.) Angelone testified that in the 1990s, they found razor blades in inmates' beards which had cut officers' hands. *Id.* at 28-29. But he also testified that it is not safe to search inmates face-to-face, and he recommends that prisons train their officers to search from behind. *Id.* at 74-50 ("[W]e're trying to get them to

---

[2] *See, e.g., Holt*, 135 S.Ct 853; *Cutter v. Wilkinson*, 544 U.S. 709, 722-725 (2005).

5

understand they need to change their training programs and have them do it and address it like law enforcement does, from the back, take control, don't become a victim"). However, Ahmed Holt, Deputy Director of Field Operations for GDOC, testified that mouths are searched at GDOC, in which inmates face the officers, open their mouths, stick out of their tongues, and a Cell Sense device is used to check for metal. (Doc. 235 at 57-58, 119.) In general, Holt said that searches are usually done with metal detectors and with random pat searches, but opined that beards would require a more extensive search and would require searching for non-metal items. (Doc. 235 at 41-42.) When asked why the same type of searching could not be done for beards, Holt stated that he could not trust that the inmate was not trying to conceal something during a self-search and that not all contraband would be detected by the metal detecting device. *Id.* at 58. This explanation is insufficient, and the grooming policy on its face is underinclusive. Holt's concerns about inmates trying to conceal contraband and hiding non-metal contraband would exist regardless of whether or not an inmate has a beard. Thus, Holt's rationale does not explain how GDOC's current search method is sufficient to search an inmate's mouth, body, and clothing but not sufficient for searching beards. Indeed, Holt did not explain exactly how three-inch head hair is searched at GDOC other than to say that it is searched from behind (Doc. 235 at 56-57, 119) – but whether it is self-searched by the inmate or searched personally by the officer – it appears that the same concerns would exist during such a search of a head or beard. Angelone also hypothesized that beards may be thicker or denser than head hair (Doc. 236 at 43), but that is not necessarily so; head hair can also be dense. The Court cannot make legal conclusions based on this unsupported potentiality.

Furthermore, Plaintiff's expert, John Clark, worked at six federal prisons in the United States, including in general management of prisons of all levels and setting grooming policies, and has forty-four years of correctional experience. (Doc. 236 at 94-95.) Clark testified that the BOP began allowing full beards and long hair for inmates in the late 1970s and that he has been involved in beard searches for most of his employment with the BOP. (Doc. 236 at 95.) Clark said that the mouth and beard are searched last, during which the prisoner opens his mouth, sticks out his tongue, an officer looks inside the mouth standing away, and then the prisoner "vigorously frisk[s]" his beard and, if it is a long beard, it must be twisted and lifted up. *Id.* at 117. He stated that "that is what worked for us," and that he has seen the same done

6

in other states' prisons. *Id.* at 117-18. He stated that it is so common that police officers perform a similar search when arresting a suspect and he has seen it performed on TV shows. *Id.* at 118. Thus, the evidence presented by Plaintiff persuasively indicates that officers do not have to put themselves in danger to effectively search a beard as implied by GDOC. Rather, the record shows that officers should use the safest method of searching, which is to require a vigorous self-search. It is implausible to think that the searches which work for head hair, mouths, and other body parts cannot possibly work for beards as well. Indeed, the under-inclusiveness of GDOC's policy as applied to beards casts serious doubt on GDOC's claim that a half-inch beard is the least restrictive means of managing safety concerns with beard searches. *Church of Lukumi Babalu Aye*, 508 U.S. at 546 (Where "[t]he proffered objectives are not pursued with respect to analogous nonreligious conduct" that suggests that "those interests could be achieved by narrower ordinances that burden[] religion to a far lesser degree.")

### 2. Concealing contraband

At trial, Ahmed Holt testified that small types of contraband such as a miniature cell phone, handcuff keys, and smart watches could be hidden in a beard. (Doc. 235 at 48:24-49:16, 78-79.) On the other hand, the BOP's John Clark testified that beards of any length are allowed in federal prisons and that beards are not an issue. (Doc. 236 at 113-116, 120).

Although GDOC has concerns about inmates hiding contraband in beards, Holt admits that inmates hide contraband: "Everywhere. Contraband is found on their person, in their clothing, in their hair, under their arms, in their orifices, any number of ways -- places. They hide contraband inside their dorms. They hide it under their beds and behind toilets, under toilets, in the window seals, any place that they have an opportunity to hide contraband. Any place that they feel like we will have least opportunity to find that item." (Doc. 235 at 51.) But if inmates do hide contraband in all of these places, then GDOC must offer persuasive reasons why beards longer than a half-inch cannot be allowed for religious reasons. Indeed, "[h]air on the head is a more plausible place to hide contraband than a [] beard — and the same is true of an inmate's clothing and shoes. Nevertheless, the Department does not require

7

inmates to go about bald, barefoot, or naked." *Holt*, 135 S. Ct. at 865-66.[3] Defendant's witness Angelone testified that contraband in beards does not present different risks or dangers than contraband in clothes—"[t]hey're all the same." (Doc. 236 at 44:22-24.) Like Holt, he stated that inmates will hide contraband anywhere they think they can get away with it. *Id.* at 28. And Clark testified that in his decades of experience with prisoners being allowed beards, "it wasn't an issue. Nobody -- it just didn't come up, that beards presented a safety problem." (Doc. 236 at 120.) Consistent with the evidence and testimony of GDOC's witnesses, he stated that having procedures for routinely searching beards is "a great deterrent . . . inmates are going to put their contraband somewhere else." *Id.* at 125. As such, GDOC has failed to demonstrate why beards would pose a contraband problem if they were searched along with head hair, mouths, and clothes. Indeed, as in *Holt*, GDOC has failed to meet its "exceptionally demanding" burden because it has not shown that its concerns about contraband in beards cannot be addressed by simply searching beards, especially where longer head hair is allowed and can be adequately searched. 135 S.Ct. at 858. It has not shown that one is superior to the other for hiding contraband.

### 3. Jealousy, Gang Identification, Hygiene, and Violence

Holt testified that a beard can be grabbed and cause injury to an inmate. (Doc. 235 at 64.) But, such testimony appears speculative because beards longer than a half-inch are not allowed by GDOC inmates, and Holt provides no basis for this opinion. Indeed, Clark testified that "in the real world, evidentially based there is no evidence that that's a risk." (Doc. 236 at 122.) Furthermore, if long hair is dangerous in this way, then it would be at least as dangerous for female inmates who can grow their head hair to any length and prison staff, who are allowed beards.[4] Thus, again, GDOC has failed to demonstrate why beard hair cannot be accommodated for religious reasons, but there are no restrictions on long hair for women and staff.

GDOC's Ahmed Holt also asserted that beards will be a source of jealousy if some inmates are allowed to have them and others are not. (Doc. 235 at 62.) But Holt also stated

---

[3] The Court finds that this is true even if the beard hair is longer than a half-inch.
[4] Holt stated that there is a limit on beard length for CERT officers, but did not want to state what that limit was for security reasons. (Doc. 235 at 142.) GDOC also made no argument that female inmates do not grab hair to harm other female inmates.

8

that inmates fight and even kill over anything, like not being repaid for a honey bun, a hair in their food, taking the Jewish star, Muslims praying while others are watching television, and rewards for a clean dorm. (Doc. 235 at 61-62, 73, 139.) Yet, there is no indication that these provisions are no longer made, and religious exceptions still exist to allow unique things for certain inmates, such as religious clothing articles. *Id.* at 75, 131. In fact, Clark testified that he does not know if there is any evidence that allowing beards for religious reasons would cause violent jealousy; he actually believed that prisoners who won their lawsuits against the prison would be admired. (Doc. 236 at 129-30.) Indeed, GDOC's assertions to the contrary are pure conjecture as it has no experience with beards and has not sought to inquire about these issues with states that allow beards. The law requires that religious exercises of institutionalized persons not be substantially burdened unless the government shows that it is furthering compelling governmental interests through the least restrictive means. 42 U.S.C. § 2000cc *et seq.* Preventing hypothetical inmate jealousy hardly seems compelling.

GDOC is also concerned that Muslim inmates will use their beards to identify with each other, making it easier for them to commit violence as a group. But Muslim inmates are aleady allowed to wear kufi hats, another way to identify with each other. (Doc. 235 at 131.) Although Holt testified that not all Muslim inmates wear kufis and that they are not worn all of the time, some, if not most, Muslim inmates do wear kufis often, and yet, kufis are still allowed. *Id.* Moreover, if identification was important to Muslim inmates, they could more easily identify with each other by simply wearing their kufis, and the fact that they do not all wear kufis indicates that identification may not be as important as GDOC implies.

GDOC also asserts that beards could present hygiene issues and hide medical problems on the skin. For example, Angelone testified that after he implemented a no-beard policy in Virginia, officers found a cancerous tumor under one inmate's beard and a black widow spider in another Rastafarian's head hair. (Doc. 236 at 25.) When asked why head hair did not present the same hygiene concerns as beards, Holt responded that inmates receive regular haircuts, during which their head is observed and any sores require them to have medical attention. (Doc. 235 at 73-74.) Obviously then, it follows that the same procedure could be implemented

9

for beards, requiring regular trimming and inspection during haircuts.[5] Furthermore, GDOC's grooming policy already requires inmates to keep their facial hair "clean and neat," and Smith has testified that "neatness and cleanliness is another tenet of [his] religion," including in his facial hair. (Docs. 183-22 at 6 & 183-3 at 25.)[6] Thus, GDOC has not shown that its policy limiting beards to one-half inch is the least restrictive means of furthering its compelling interests in hygiene, especially as applied to Smith.

In sum, the evidence and record in this case indicate to the Court that GDOC's policy on beards is underinclusive. Beards do not appear to present any more of a problem than longer head hair or clothes, and as in *Holt*, GDOC has failed to adequately rationalize why its policy is underinclusive. *Holt*, 135 S. Ct. at 865. Furthermore, as will be explained below, GDOC has provided no rational explanation for allowing three inches of head hair but not allowing the same length in beards.

### B. Less Restrictive Alternatives

The government's burden of demonstrating that its policy is the least restrictive means of furthering its interests is "exceptionally demanding." *Holt*, 135 S. Ct. at 864 (citation omitted). The government cannot simply assert that other alternatives are unworkable but must prove that it lacks other means to achieve its desired goal without substantially burdening a religious exercise. *Holt*; 135 S. Ct. at 866; *Hobby Lobby*, 134 S. Ct. at 2780; *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 824 (2000).

Plaintiff has shown that 37 states and the BOP allow untrimmed beards either for all inmates or as a religious exception. (Doc. 236 at 162-63; Doc. 176 at 2; Doc. 213 at 13.) Another four states allow inmates with a religious exemption to grow a beard longer than a half-inch. (Doc. 236 at 162-63; Doc. 213 at 13.) Thus, nearly three quarters of states plus the BOP allow untrimmed beards, and even more allow beards longer than GDOC currently allows. "[W]hen so many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course . . . . " *Holt*, 135 S. Ct. at 866. Furthermore, "if a less restrictive means is available for the Government to achieve its

---

[5] The Court understands that this procedure could be implemented for trimmed beards, but even untrimmed beards could also be inspected during an inmate's regular haircut.
[6] There is no evidence in this case that Smith has had hygiene problems at GDOC.

10

goals, the Government must use it." *Playboy Entm't Grp., Inc.*, 529 U.S. at 815 (quoted in *Holt*, 135 S.Ct. at 864).

Although the current policy is underinclusive in many respects, GDOC has offered logical and persuasive reasons to show that allowing untrimmed beards would be unmanageable for GDOC. First, GDOC has shown that its female inmates are less violent: a smaller percentage of them are classified as violent, and in 2016 and 2017, there were no homicides in female facilities compared to at least ten homicides during the same years in male facilities. (Doc. 183-5 ¶¶ 17, 29-30.) Plaintiff has offered no evidence to the contrary on this point, and it is logical for the Court to conclude that given the differences between the small, less violent female population and the large, more violent male population, different grooming policies, at least to some extent, are appropriate. Furthermore, GDOC has shown that its low staffing and high turnover rates play a significant part in its ability to monitor inmates and conduct searches. (Doc. 235 at 59, 79-80.) While three inches of head hair is manageable, it is plausible that a beard of unlimited length could be much more difficult for GDOC to manage given, *e.g.*, its ability to be used to cause harm in the more violent male facilities, its ability to hide contraband more easily, the added difficulty in searching an untrimmed beard, and its ability to disguise a face. (Doc. 236 at 36:19-37:1.) Indeed, courts should "apply the [RLUIPA's] standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Knight*, 797 F.3d at 944 (citation omitted). As such, the Court finds that GDOC has offered persuasive reasons why it cannot allow untrimmed beards at this time for which deference is due. However, the same reasons are not nearly as persuasive when applied to a three inch-beard.

First, a three-inch beard cannot as easily be grabbed and used to cause harm. GDOC's witness Angelone testified regarding a three-inch beard that "I think you could grab it, but if you wanted to pull someone around and throw them into the wall, you'd have to have an awful good grasp of three inches to being able to do that. But, the longer the hair, the more forceful the individual would be thrown into a wall." (Doc. 236 at 70:13-21.) Furthermore, if three inches of head hair is not a concern for hiding contraband or causing injury, then neither can three inches of beard hair be a plausible concern. The Court has already rejected GDOC's

argument that staff must personally search inmate's beards face-to-face and expose themselves, and GDOC has offered no logical explanation as to why it could not use the method currently employed by BOP and other states for searching a beard.

The strongest argument that GDOC presented that applies to three-inch beards is that it could disguise an inmate's face and make an attempt to capture him more difficult. Angelone testified that in the 1990s, he started a no-facial-hair policy in Virginia after an inmate escaped who had "red hair that went down his back and over his shoulders [and] a beard that went down to his belt buckle." (Doc. 236 at 23-24.) A few days later, the inmate was found loitering and had no ID, and after being fingerprinted, officers realized he was the escaped inmate but his appearance was completely different because he had shaved. *Id.* at 24. He testified that, in general, officers have difficulty recognizing distinct facial features of inmates of other ethnicities, and that facial hair presents another barrier to making identifications.[7] *Id.* at 25-26. GDOC asserts that "untrimmed beards make it harder to identify inmates, because with long beards, officers lack facial recognition of the inmate, which is the main way people identify with another." (Doc. 240 at 7) (citing Doc. 235 at 67-69) (explaining that it took days to recapture an escaped inmate who looked different because he had shaved and lost weight). But although these concerns may be presented by an untrimmed, belt-buckle-length beard, GDOC has not shown that it could not effectively implement a three-inch beard policy and still successfully identify inmates after they shave.

Angelone hypothesized that taking photos when an inmate's appearance changes would be expensive and that there would be no place to store them. (Doc. 236 at 46.) Holt also testified that taking photos only works if they manage to take a photo before an inmate escapes. (Doc. 235 at 68.) But GDOC's policy already requires that inmates' photos be taken annually *and* whenever their appearance changes. (Doc. 235 at 142-43; Doc. 183-22 at 68-69.) The photos are stored digitally, and each facility in GDOC has the equipment to take these photos. (Doc. 235 at 142-43.) Further, the policy requires that photos be taken when inmates leave on transfer, reducing the difficulty of a recapture if an inmate escapes while being

---

[7] The Court notes that mustaches and half-inch beards are allowed, and it appears that this facial identification issue would exist with any facial hair. Furthermore, training officers and having a method for identifying inmates with or without facial hair seems a better solution than prohibiting any facial hair.

12

transferred. (Doc. 235 at 145-46.) Thus, it appears that GDOC's concerns about identifying inmates could be addressed by enforcing the policy that GDOC already has and making improvements. Plaintiff's expert Clark testified that GDOC's policy is "similar to what is successfully implemented around the country," and that some states require a clean-shaven photograph upon intake and then take regular photographs thereafter. (Doc. 236 at 115.) He further testified that to alleviate the concern that an inmate's face would age over time and might look very different after being shaved, some states require an inmate to periodically shave and take a new picture and then regrow their beard. (Doc. 236 at 172) (citing Texas as an example). While requiring periodic shaving for a new picture may not be ideal for people seeking a religious exemption, it is certainly a less restrictive alternative than the current policy prohibiting beards longer than a half-inch. *Holt v. Hobbs*, 135 S. Ct. 853, 858 (2015) ("[R]equiring inmates to be photographed both with and without beards and then periodically thereafter is a less restrictive means of solving the Department's identification concerns.") Indeed, GDOC itself proposed as fact that: "Three inches of head hair is different than untrimmed beards. Three inches of hair cannot be as easily grabbed, can be searched from behind, does not cause as many concerns with inmate identification, and is regularly cut so as to detect hygiene issues." (Doc. 240 at 12.) Accepting those facts as true, the Court concludes that three inches of beard hair is distinct from an untrimmed beard for very similar reasons: it cannot be easily grabbed, it can be safely searched, it can be periodically shaven to address inmate identification concerns, and it can be regularly cut to detect hygiene issues. Indeed, the Court is persuaded that all of GDOC's concerns about a three-inch beard could be resolved by adopting sound policies on beards and training staff on the new policies.

Notwithstanding that beards longer than a half-inch are allowed in most prison systems, GDOC asserts that its prisons are different because they house a large number of more violent inmates and they don't have the same staff ratios and resources to accommodate beards. (Doc. 235 at 103-104, 146-148.) But the only specific differences Holt was able to identify were that California has catwalks and AR-15s and that New York has better staffing ratios. *Id.* at 104, 147. On the other hand, Clark, who has looked into the staffing ratios around the country, testified that GDOC is staffed slightly better than the BOP, and that both GDOC and BOP's staffing is in the middle for prison systems in the United States at about four staff

per inmate. (Doc. 236 at 133-34.) Furthermore, GDOC has no information on the percentage of violent inmates in other prison systems, gang membership in other prison systems, or inmates serving a life sentence in other prison systems. (Doc. 235 at 146-48.) In fact, GDOC has not even attempted to determine how other states manage inmates with beards. (Doc. 235 at 148.) The testimony of GDOC's director made clear that because his primary concern is the safety of the CERT team members and officers, he is "not adding to the already difficult task of managing inmates" by checking to see how beards are managed elsewhere. *Id.* But the changes to GDOC's task of managing inmates would only be minor if GDOC were to allow three-inch beards. It would take only seconds to include a beard in a search. (Doc. 236 at 39-41, 117.) And because GDOC's policy already requires photographs to be taken whenever an inmate's appearance changes, the only other addition needed to address GDOC's concern of facial changes over long periods of time is to require occasional clean-shaven photos. GDOC cannot merely "explain" why it cannot allow an exemption but must "prove that denying the exemption is the least restrictive means of furthering a compelling governmental interest." *Holt*, 135 S. Ct. at 864. To-date, GDOC has failed to offer persuasive reasons why it cannot implement these changes.

Notwithstanding GDOC's numerous assertions that beards lead to more violence, contraband smuggling, and security issues, GDOC offered no evidence showing that states that allow beards experience more of these issues. (Doc. 236 at 78-79; Doc. 235 at 149-150.) On the other hand, the BOP asserted that allowing inmates to practice their religion "helped prisoners develop themselves" and "made the environment safer." (Doc. 236 at 111-12.) Thus, it could very well be that GDOC's interests in prison safety and security would be furthered if it allows longer beards.

### C. GDOC's Policy as Applied to Smith

RLUIPA . . . "contemplates a 'more focused' inquiry and 'requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' – the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 135 S. Ct. at 863 (citations omitted). RLUIPA requires courts to "'scrutinize the asserted harm of granting specific exemptions to particular religious claimants'" and 'to look to the marginal interest in enforcing' the challenged government

action in that particular context." *Id.* (citation omitted). Here, that is GDOC's policy to prevent Smith from growing longer than a half-inch beard in accordance with his religion. *See id.*

GDOC has argued that Smith's criminal history and disciplinary issues while incarcerated may be grounds to deny him an exemption. (Doc. 240 at 9.) Specifically, GDOC asserts that Smith "is a convicted murderer who has been sentenced to life," "is a maximum security inmate who is likely to stay in GDC's maximum security prisons," and that "[s]ince being in prison, Smith has been found guilty of 44 disciplinary infractions, including possession of cell phone twice, possession of drugs, possession of weapons, assaults on inmates, threats to correctional officers, assaults on correctional officers three times, and for failing to follow instructions or being insubordinate." *Id.* GDOC also asserts that "Smith's behavior in prison is indicative of the gang behavior seen by Muslim inmates." *Id.* GDOC argues that its disciplinary system if Smith violates rules is not adequate because of Smith's "propensity to assault correctional officers and inmates and smuggle in contraband" and "does not prevent Mr. Smith from engaging in the violent behaviors on the front end." *Id.* at 11. This is certainly relevant. Many courts have affirmed prison grooming policies when applied against maximum security inmates and even in minimum security facilities. *See, e.g.*, *Fegans v. Norris*, 537 F.3d 897, 903 (8th Cir. 2008), *Knight*, 797 F.3d at 937-38 (affirming short hair policy where no plaintiff was in maximum security); *cf. Warsoldier v. Woodford*, 418 F.3d 989, 1002 (9th Cir. 2005) (finding that prison "utterly failed to demonstrate that the disputed grooming policy is the least restrictive means" as applied to a minimum security inmate). As such, it is plausible that allowing a close security inmate like Smith an untrimmed beard could be dangerous for prison security. *See Knight v. Thompson*, 796 F.3d 1289, 1292 (11th Cir. 2015) (affirming policy not allowing exemption of "long, unshorn hair"). However, GDOC's argument is unpersuasive in the context of allowing a three-inch beard because GDOC has presented little evidence to show that a three-inch beard is a significant security concern, and it already allows three-inch head hair. *Ali v. Stephens*, 822 F.3d 776, 789 n.10 (5th Cir. 2016) ("[A] complete exemption in order to wear head hair unshorn, [] raises factual issues that are distinct from a request for a beard that is four-inches."). It is simply hard to fathom how three inches of hair covering the entire head is permissible but three inches of hair on the bottom of the face is unworkable. RLUIPA does not permit the Court to give GDOC such "unquestioning

deference." *Holt*, 135 S. Ct. at 864; *Knight*, 797 F.3d at 937 ("[P]olicies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements.") Furthermore, GDOC should enforce, and amend if necessary, the disciplinary policies it has for rule violations. As Clark testified, if prisoners violate rules with their facial hair, GDOC should not allow it. (Doc. 236 at 128-29.) He testified that it was not his experience that inmates serving life sentences do not care about disciplinary reports. *Id.* Indeed, GDOC has policies in place to allow for prisoners to be moved to lower classifications, and thus have more privileges, based on their behavior. Thus, GDOC has failed to persuade the Court that Smith should be disallowed a religious exemption to grow a three-inch beard.

GDOC has also made numerous arguments that the costs of allowing a longer beard exemption for thousands of inmates would be too high. (*See* Docs. 240 at 15; 235 at 147.)[8] But, again, GDOC has offered no evidence showing that its budget cannot allow three-inch beards or that its budget is different from states that allow beards. (*See, e.g.*, Doc. 235 at 149) (stating that Florida's budget is double the budget of Georgia's, but that Florida also has double the inmates). The Government must produce evidence to persuade the Court that denying Plaintiff's request furthers its compelling interest in cost control. It has not done so. GDOC argues that providing combs to inmates for beard searches would be "very expensive and impractical," (Doc. 240 at 10) but there is no reason why combs would need to be used in beard searches; there is no evidence that they are currently used in head hair searches. Furthermore, Plaintiff's witness, Clark, testified that costs would be a minimal factor for GDOC, that no staffing changes would be needed, and that searches may take only an additional three seconds. (Doc. 182 at 48-49.) Thus, GDOC's cost and staffing arguments are unpersuasive. Even if costs are a factor, RLIUPA provides that the government may be required to incur expenses in its operations to avoid imposing a substantial burden on one's exercise of religion. 42 U.S.C. § 2000cc-3(c).

---

[8] The Court notes that the general argument against making exceptions has already been rejected by the Supreme Court. *See Holt*, 135 S. Ct. at 866 (rejecting the argument that "[i]f I make an exception for you, I'll have to make one for everybody, so no exceptions").

16

Here, GDOC has focused on the difficulties of allowing untrimmed beards, but it has failed to show that its policy is the least restrictive means when applied to an exemption to allow a three-inch beard. Indeed, the Court has already explained throughout this opinion how GDOC's concerns can be adequately addressed if it allows three-inch beards. And unlike in *Knight*, Smith has testified that although it is preferable in his religion not to trim his beard, he must maintain "at least no minimum than a fistful… to be able to grab a fistful of [] beard." Doc. 183-3 at 25. Smith has not specified how long a fist-length beard is, but case law indicates that between three and four inches is appropriate. *See, e.g.*, *Sims v. Jones*, No. 4:16cv49-WS/CAS, 2018 U.S. Dist. LEXIS 174436, at *18 (N.D. Fla. Aug. 8, 2018) (plaintiff stating that "fist-full" is "3 inches or a little more"); *Ali v. Stephens*, 822 F.3d 776, 780 (5th Cir. 2016) (explaining that "fist-length" is four inches). The Court especially finds three inches appropriate in light of the GDOC's policy allowing male inmates to have three inches of head hair, and GDOC has failed to present evidence showing that three inches of beard hair on inmates is not likewise manageable for GDOC. Thus, the Court finds that allowing religious exemptions for inmates to grow three-inch beards is a reasonable less restrictive alternative of furthering GDOC's compelling interests.

The Court further finds that the factors warranting a permanent injunction in favor of Plaintiff are met here. *Cowart v. Gonzales*, No. 7:03-CV-139 (HL), 2008 U.S. Dist. LEXIS 120485, at *2 (M.D. Ga. May 16, 2008). Smith has prevailed in showing that he has a right to wear a beard up to three inches in length consistent with RLUIPA and that GDOC's grooming policy unlawfully burdens that right. There is no adequate remedy at law for the violation of this right, and 42 U.S.C. § 1997e(e) precludes an award of monetary damages absent physical injury. Thus, the loss of this right creates an irreparable harm that can only be remedied by injunctive relief. The injunction in this case would serve the public interest and is narrowly drawn only to the extent necessary to correct the violation of Smith's right to grow a beard consistent with RLUIPA and complies with 18 US.C. § 3626 and Federal Rule of Civil Procedure 65.

## CONCLUSION

Accordingly, after considering the evidence and applicable law, the Court makes the Findings of Fact and Conclusions of Law as stated herein. The Court **DIRECTS** the Clerk of Court to enter Judgment as follows:

(1) In favor of Plaintiff on his RLUIPA claim as to Defendant's grooming policy on beard length.

a. The Court **DECLARES** that Defendant's policy limiting inmates' beard length to one-half inch without any religious exemptions violates the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq*.

b. The Georgia Department of Corrections **SHALL** modify its grooming policy to allow inmates qualifying for a religious exemption to grow a beard up to three inches in length, said exemption being subject to revocation based on the inmate's behavior and compliance with the revised grooming policy, and **SHALL** provide Plaintiff Lester Smith with such an exemption.

Attorneys for Plaintiff are entitled to reasonable attorneys' fees under 42 U.S.C. § 1988 in an amount to be determined based on affidavits and records to be submitted by counsel after judgment is entered in this case.

**SO ORDERED**, this  7th  day of August 2019.

                                              **/s/ W. Louis Sands**
                                              **W. LOUIS SANDS, SR. JUDGE**
                                              **UNITED STATES DISTRICT COURT**